David Freenock, on behalf of the appellant Bill Newman, I will reserve three minutes of my time for rebuttal. This appeal concerns two equitable doctrines under California law, alter ego and unclean hands. Two questions under those doctrines are whether the magistrate judge correctly applied prong two of the alter ego test, which is the bad faith or inequitable result prong, and whether the magistrate judge correctly applied prongs two and three of the unclean hands test. I mean, how can you rely on corporate separateness for a corporation that didn't exist during the relevant timeframe? Well, a good question, Judge Collins. I don't think we rely on that. One, we're not challenging prong one as to whether it was a satisfied prong one or- No, but it seems inequitable to- There's a confusion in the statement of decision, I believe, by the magistrate judge between whether a corporation existed, which it did as Drone Concepts, and whether the name had been changed. The corporation existed before these contracts were entered into. Drone Concept existed in February. Well, some corporation existed. I mean, from one perspective, what this looks like is once they decided to terminate this relationship, it fell apart, and we see some of that in the background here. Then they realized, oh, my goodness, we never actually created this corporation, so they find some Wyoming corporation and change its name to the relevant entity. I mean, that looks inequitable. Again, I don't think that's what happened. The corporation existed and the name just hadn't changed yet. That's a confusion of- Is there some indicia in the evidence that it was clear that that Wyoming corporation was, in fact, the corporation that was intended all along to serve in this role? I'm not sure of that. I want to focus on clean hands and prong two. I do believe, again, there's no question as to unity of interest. The question as to whether, I believe what you're saying is the inequitable conduct happens at the point of entry when the contract is signed because the corporation's name hasn't changed yet. I think there's other questions we want to get to that we think that are not done correctly under these standards, under the equitable standards. I do want to start with the unclean hands, though, because I think that actually informs and is the first place that- Well, I understood you were making two alternative arguments that the second element of alter ego wasn't met and unclean hands. I wanted to hear your argument about the second part of alter ego. As you can tell, I'm having trouble with it, and this is your opportunity to try and set me straight. I had planned to go out of order, but I can move to just prong two of alter ego, which is the bad faith conduct. The bad faith conduct here, I think there were essentially three facts. One was that Mr. Newman held himself out as a successful business person. Another was that he had offered to or promised to invest some amount of money into CAEAP after Lux had purchased it. And the third fact was that there was a corporate form that was used to sign the contract. There's two issues with that. The first is that those factual findings don't actually show bad faith. Truthfully representing yourself as a successful businessman during negotiations, that's not misconduct. Electing to use a corporate form, that's not bad faith. It's unremarkable people use the corporate form to enter into these agreements. Again, I don't think there's actually a situation where the corporation didn't exist. There was a corporation. Its name just hadn't changed yet. That's very different from bringing a corporation into existence after an agreement has been signed. But does the record show evidence that that corporation was engaged in relevant activities with respect to this relationship? For the name change? Yes. This is when the court is talking about Lux EAP, it's talking about the drone concept of corporation. So the court even itself was acknowledging that there is a lot- And did drone concepts have a prior business experience? Was it in some market? No. No. It was nothing? It was just a name? Correct. I mean, it was a company that had been formed and the name hadn't changed yet. Okay. Right. But I mean, but it was a company that was a company of name only. It wasn't doing anything. It just didn't have the right name. Correct. Okay. So it's got the wrong name and it doesn't have anything that it does. Because the plan was that these companies would exist in these different states to take over these EAPs. And so under the, again, we're on prong two, the bad faith conduct here, it sounds like what the court is focusing on is at the point of entry when the alter ego test is about, you know, having specific liability for a specific person. And so there is, this is, again, whether there's a temporal requirement, it's, it's undisputed under California law that there is a temporal requirement for the unit of interest test. And we believe it's also the case for the inequitable result or bad faith test. There is still a temporal requirement. And there is no actual bad faith at the time that the liability arises because it's undisputed that the reason why this company shut down was because after Lux had essentially spent money developing, or I should say implementing, the CRM technology, they realized that the utilization rates for these EAP programs were a fraction of what had been told to them and what had been reported to clients. And this, again, I don't want to run into unclean hands, but the reason why the temporal aspect matters is because the bridge of contract that gives rise to the liability here, the reason that Lux shuts down, the reason that Mr. Newman doesn't invest more money is they discover that they've been cooking the books here by including a greater population in the numerator and denominator by allowing neighbors of employees to access. Well, you call it cooking the books, but what's our standard of review of the district court's analysis of the unclean hands issue and the inequities? Well, I think it depends on what question we're talking about. So there is going to be de novo questions here because you can see in the statement of decision, the magistrate judge discusses at great length harm or the actual misleading of the clients. There is no prejudice requirement. There's no harm requirement. So when the magistrate judge is discussing that, you know, this wasn't the way that CAEAP made its money or the clients weren't misled because the clients had agreed to these inaccurate numbers for some reason or Mr. Newman wasn't harmed, there is no harm element. So that would be a de novo question, for example. There are going to be abusive discretion questions as well. But I think the magistrate judge's kind of central error here is that under their relationship- You used the phrase cooking the books. You're sounding like intentional misrepresentation. I don't see anything in the magistrate judge's findings that suggest that the district court found intentional misrepresentation. And nor do you need intentional misrepresentation to satisfy the unconscientious prong of unclean It's not a fraud case. So you don't need to show that there is an intentional misrepresentation. Okay. So we'll set aside the rhetoric of cooking the books. I apologize for the rhetoric. I meant that there are inflated numbers here and they're inflated in numerous different ways. But even in terms of inflated, didn't the lower court find that there was not one means or not one way of evaluating these numbers and that there were six different accounting methods? That's correct. The fact that there's no universal standard to calculate EAP rates doesn't mean that any standard goes. When you start including neighbors in the numerator and a greater population in the numerator than the denominator, you can have rates that are over 100%. That can't be proper under any standard. There's no good faith basis to do the math that way. There's no good faith basis to report a 0% utilization back to the client or not to report the back to the client when it is in fact 0%. Do you agree that the lower court correctly analyzed, analogized this with one of the six methods of evaluations? Yes, it's certainly true that one of the methods is doing the numerator and denominator, but you have to actually do that correctly. We can see here that they're including family members. If you have a wife and a spouse that both access the services, that's two in the numerator, but they only reported one in the denominator, 150% utilization. That's not possible. There's no reason to do it that way unless you are trying to inflate the number. The same is true when you report one person using two different services as two separate cases, when we know that that's not allowed under the EAP standards. There's a lot of things that are happening here to inflate these rates. We also know that there's no documentation for a large majority of the actual assessments because supposedly they were done on client site. Employees were apparently confidentially going to the Bruners and essentially them doing an assessment on client site, and there was no documentation of that. In this case, the lower court would have found that, yeah, there were certain, if not irregularities, certain things that weren't perhaps textbook in the way they should be operated, but that even taking that into account, that was outweighed by the undercapitalization, by Lux, by the other irregularities that were pointed to. No, Your Honor, and that's actually exactly, that's not correct at all. The unclean hands is not looking at, it's not weighing the misconduct between the two. It's just looking at the misconduct of the defendant. Does the defendant come with clean hands? Not who is the worst actor here, or who deserves what, it's does the defendant actually come to equity with clean hands? And so it's not a weighing of who was- If there's any unclean hands, and in your view, then that negates any recovery on the part of- If there is unconscientious conduct that is connected to the subject matter of litigation, and I believe that is where the unclean hands goes astray with the magistrate judge's decision in the actual nexus requirement. If there's unclean hands that's connected to the subject matter of litigation, yes, I do believe that that is what California law provides for. I do want to take a moment to go into the nexus requirement and what the magistrate judge has done here. The standard is just whether it relates to the subject matter of the litigation, whether it relates to the transaction. It's not whether it defeats one of the elements of the claim that's actually been pleaded. And so the magistrate judge, when she discusses on pages 24 and 25, I believe it is, she actually goes through the prongs on unclean hands and says it's not related to unity of interest, it's not related to bad faith. That's not California law. The question isn't whether it's a technical defense to one of the elements of the cause of action that's being raised. And in fact, California courts have rejected that exact approach that the magistrate judge is applying. They did so in the Pendergreen case, which we've cited. So there is actually a nexus here. You can see that the reason why, it's undisputed the reason why this company stopped functioning and shut down was because of the discovery of these inflated rates through the use of the CRM software. That's not disputed. That's the very reason why there is a breach of contract claim in this case. It's the very reason and basis for the alter ego claim. And so there is a direct nexus between here, the unconscientious conduct, which, again, the magistrate judge said it was misleading on the face of these report. This is misleading numbers. That's unconscientious conduct. And it's clear that there is that nexus satisfied here. Counsel, there's, so the whole reason that we're here is because the Bruners were awarded a judgment in the contested litigation here. And that was affirmed by us. Was there any role that Newman and Lux's claims against the Bruners played in that, in that litigation? No, that litigation, I'm kind of close to my time here. That litigation was decided essentially based on the failure to, it was a day late as to request for admission, which Judge Gee then said were admitted as a matter of law. That went up and was affirmed, although there was a very spirited dissent in that case about whether that was the right decision. After that case happened, there was then the counterclaim for the alter ego claim. So we're not here on the previous or challenging the previous decision or the breach of contract. And the claim that the books were cooked, that they were using this wrong method, did not figure in any way in that litigation? There were claims for fraudulent inducement. Again, the utilization rates are how you measure the success of an EAP program. So when Lux considered the fact that these utilization rates were far higher than the norm, and they were higher than the norm even though these were relied on kind of paper outdated systems, they believed this was a good investment because they could develop, implement technology that would raise these rates even higher. Of course, the truth was different. When they actually started using the CRM software, they saw that the rates were a fraction of what they were reported to them. So there was a fraud in the inducement claim in that case, of course. And which was, was that rejected? It was on the basis of the fact that the request for admission were admitted. If we've previously rejected this, all we're really asking here is who's going to end up paying for this thing? And so we're here on the alter ego, I'm just wondering why we get to factor this in now when it didn't factor in previously in the litigation on the merits that creates the judgment in the first place. Because the alter ego defense is subject to the unclean hands defense. These are equitable doctrines. You're still allowed to consider the inequitable, or I shouldn't say inequitable, the unconstitutionalist conduct and whether it has a nexus. The fact that Lux was, suffered a judgment against it as to the contract kind of claim doesn't preclude Mr. Newman. But isn't Lux's claim of fraud identical to Newman's claim of fraud? Well again, I think we're confusing the parties here. The alter ego claim is against Newman, and then Lux is found with a liability. So Phil Newman is the opponent here, raising the unconstitutionalist conduct. But Lux has previously raised the cooking the books fraud in the inducement claim, right? In the prior litigation. Again, yes. There was a fraud in the inducement claim about whether the utilization rates were actually accurate or misleading. But the fact that there was a previous judgment doesn't preclude this court from reaching the question of unclean hands. And of course, the magistrate judge does reach that question as a defense, too. I'm way over time, so I have to save what I have left for rebuttal. We took you over your time, so I'll give you your three minutes, you requested. And we'll hear now from Mr. Gilmour. Good morning, Your Honor. Frank Gilmour on behalf of the appellees, Kathleen and Robert Bruner. May it please the court. The first question was the best question that we've heard, and that is, how can you claim there is no alter ego here when the contracting entity that purportedly operated this business for nearly a year never existed? The problem I've got with the appellant's brief and their arguments is the liberty with which they've taken to expand on the facts that are not in the record, claim undisputed contentions which are clearly disputed. In the supplemental excerpt that we provided, we established that Drone Concepts was a Wyoming LLC with no assets. It was administratively dissolved months before the date of its reinstatement, and it was administratively dissolved because it was not paying the required taxes due in Wyoming. And it was not reinstated until the day that Newman's managers sent a letter to the CAEAP clients blaming my clients of committing fraud, and then, as the magistrate judge says, turned out the lights and shut the door on the business. The Drone Concepts was reinstated and renamed specifically for the purpose of, so was the entity that was Drone Concepts, and then there was another name. Is there any evidence in the record that it had any involvement in any activity related to this relationship? None whatsoever. In fact, the uncontroverted evidence in the record is, in fact, that even Newman himself could not identify a single tenant of the Drone Concepts business. It had no assets. It had no involvement whatsoever in the CAEAP business. But opposing counsel said, you know, all this stuff about, you know, the lack of a relationship and the company not technically existing and the name changing, all that goes to the first prong of the alter ego, and he's not challenging the first prong. It's really just the second prong. I disagree. I think because of the equitable nature of the second prong of the alter ego theory, the court's required to consider all of the evidence that lead to the inequitable result that Mr. Newman is using this entity as a sham in order to cause an injustice upon my clients. In fact, the Paramount case cited by the appellants, the J.P.B. Ketting case, says that verbatim in the second or third paragraph, where it says, we're critical of the trial judge in that case because the trial judge is identifying the standard of alter ego too narrowly. That's exactly the argument that the appellant's presenting here, that the court should take this time, the magistrate judge improperly took this time agnostic view of the causation requirement that when the magistrate judge focused only on the fraud in the original inducement of the consulting agreements and not on the day that they allege the contract was breached, which was the day they stopped making payments to my clients in 2017. That is absolutely not the standard that's applicable for the totality of the circumstances in an equitable case, particularly in the second prong of the alter ego, and the judge acknowledged that. Magistrate judge said, there are a host of facts that made this inequitable from day one up until the day they turned out the lights and shut the doors. There was, in fact, the evidence, Judge Collins, at trial was established that the entity lux at no point during the year it operated ever had any appearance in any of the bank records. It never had a contract. It never sent a representative to a CAEAP client to renew or negotiate a contract. The words lux EAP never made it into anything associated with the operation of this business from the day the consulting agreement was signed until a year later when they reinstated it and renamed it lux EAP specifically for the purpose of filing a lawsuit against my clients. Can you address their unclean hands defense because his view is it's not a weighing of whose hands are dirtier, but if there's any inequitable conduct in the district court made a specific finding that on its face the numbers were misleading on the usage rate. And I'll note the appellants hang their hat quite heavily on that prong. But if you look at the totality of magistrate judge's assessment of the facts related to the unclean's hand defense, what she says is, okay, I'll grant you that if you just look at the face of the utilization reports, you might wonder why they appear to be understated. And then she went through a host of factors where she actually established, I think, that in fact what appeared on the face to be perhaps misstated is not actually misstated at all. And here's an important point that needs to be driven home here. The affirmative defense of unclean hands is the defendant's burden to prove. He had the opportunity, as you alluded to in your questioning, he had the ability to go and do discovery. He could have brought in and reinstated the fraud and the inducement claim that was raised in the original district court action. He could have brought in... You never raised any kind of preclusion argument that they couldn't argue what they're arguing on unclean hands because of that prior... Indeed, we stipulated that it was not res judicata because the findings as it pertained to Lux were not preclusive of Newman's ability to argue that my clients engaged in bad faith conduct and therefore approached the court with bad faith. And so what you would have expected from a defendant with an affirmative defense duty to show up and say, here's how I'm going to establish the utilization rate fraud. I would hire an expert. They didn't do that. They had no testimony from a single EAP witness at trial, bar none. Mr. Newman testified he's not an EAP witness, he's not an EAP expert, he doesn't even know the business. Mr. Gorzinski, who was the day-to-day operator, was an AT&T phone man who was there to set up the communication system for the call center. They didn't present one witness that was able to come in and say, this is the standard for EAP utilization and this is why it was breached. The only evidence they have was Exhibit 80, which was an exhibit we produced, which said exactly what you said, Judge, which is there can be no standard, applicable standard upon which utilization rates apply for a lot of reasons. One of those is sometimes EAP providers don't want to have to publish how they calculate their rates. What the court ultimately found, what Magistrate ultimately found in this case was that the, I think she said it was a battle of the culture, the old versus the new. That although the reports that my clients had prepared appeared on their face to be understated, there was a host of legitimate reasons why that could have occurred. She cited a number of facts on the record that were not disputed in any way. For example, Mr. Bruner was a day-to-day operator in the field, City of Riverside. He was meeting with the police department. He was handling on-site issues when there were catastrophes, when there was employee-related issues, when there was officer shootings. He represented those people and he was on-site with them every day. He would give a seminar. Somebody would come and say, can I talk to you about something? And he would talk to that person. Mr. Bruner testified that on his way home, he would call his wife Kathy and say, I just met with the captain of the police department and I gave him some resources on how he can handle this issue. Make that notation in your utilization report. What the judge specifically found, and it's in her statement of decision, is that at no point in time did Newman or his managers ever do anything like that. In fact, she specifically made the finding that's not challenged, that Mr. Bruner urged them during his consulting period, please come with me to the clients and meet them so that we can start introducing you to them. You can start making those relationships. This is a relationship business. And the testimony, uncontroverted, was that they refused to do so. Go ahead. I'm sorry. There's an assertion that was made by Mr. Freenock that there's no dispute that the company shut down due to the inflation of the utilization rates. What does the record show in terms of when it learned of this inaccurate or improper utilization rate? The record suggests that when Lux took over, or Newman's group took over the company in approximately early May of 2016, that they started to have questions about the utilization rates near the end of the year. And that there, so the end of 2016, three or four months before May. And there's some reference that the CAEAP's contracts with clients made reference to this form of inflation? Right, right. And another finding that was no controverted evidence at trial that Magistrate Judge made, which is that there was no evidence that any contract was ever impacted whatsoever by the utilization rates. In fact, what the judge specifically found was that these are flat rate contracts. So not only did she say in her statement of decision that this is not a scenario where she believes that they were intentionally understated, she's saying they never established a relationship, a causal relationship to the utilization reports in the quarterly statements to the ability of the company to make money. And that's why I would, as I said early on, Ms. Counsel argues that, well, it's undisputed that the reason they turned the lights off was because they were not willing to send utilization reports, which would result in the revenues being torpedoed. There's no evidence in the record whatsoever that that was ever going to be the case. In fact, the only evidence that was ever presented was Ms. Bruner's testimony where she said, we give the utilization reports to the customers in order to show them that we're using it. But that doesn't mean that if there was a utilization that came in below what we had represented that they would stop using it. The testimony was that the customers use the services because it's something that they feel they need to be able to provide for their employees. And so what Magistrate Judge found is there was never any direct nexus established in the affirmative defense that utilization rate was ever going to bear on revenue. So it is not uncontroverted that they shut down the business because they weren't willing to submit utilization reports that were below what they had done before. They never met with a customer to discuss the issue. So what I would say is it's convenient and pretextual. They say, well, we shut the business down because we were in no position to be able to go to these clients and establish that because the utilization rates look lower using the electronic system than they did using the hand notation system that Ms. Bruner is using, they presented no evidence of that. It's not an undisputed contention. It's a contention and a conclusion with no evidence. The only conclusion the court could make based on what the evidence was presented is the exact same type of evidence that was presented originally in the judgment, which is that there is no direct correlation in the record between the utilization rates and the revenue of the company. In fact, I asked Mr. Newman that exact question not only in his deposition but on the stand. And I said, tell me how you can testify that there is a relationship between the utilization rates and the revenue or profitability of the company if you never spoke to a single customer. You never went to a single meeting where you negotiated a renewal of an evergreen contract. You never, ever dove into the facts that would provide how these contracts were priced or the scope of the services that was providing was determinative of the breadth of what types of services the employees could receive or how that was valued by the customers or the  Those are all things that could have been discovered and established at trial and they were not. So the contention that this is an undisputed conclusion that the business was shuttered by Mr. Newman because he was worried about reporting underutilization and therefore causing a negative impact on the business's net revenues is a totally false conclusion that has no substantive evidence. And that's an explicit finding in the statement. Counsel said that under California law, it's undisputed that there's a temporal requirement timing the bad faith conduct to the damages suffered by the plaintiff. There's no such case. The case that they cite, which is JPV1LP, actually says the opposite. JPV1LP could be my paramount case because it says all the things that I've been arguing. Namely, number one, that we have to use the totality of the circumstances surrounding the factual question. I could cite a host of sections. There is no litmus test to determine when the corporate veil will be pierced. Rather, the result will depend on the circumstances of each particular case. We're talking about a person who misled my clients to execute the contract in the first place by referencing the Carlyle management and then using the name Lux. The name Lux was intentionally inducing my clients to believe that this was backed by Carlyle management. And the contract specifically said that they would not only invest the million dollars, but that they would bring in two EAP professionals to replace the Bruners as they exited. They didn't do that. And then when we tried to do discovery on him in the depositions about where this money was going, he lied intentionally and knowingly in the deposition and then admitted it at trial that he had perjured himself and that he did it in order to try to prevent us from finding out where the money went. All of those things belong in the litmus test of whether or not it's equitable for him to hide behind the sham entity that never existed. And with that, if there's no further questions, I'll rest on my papers. All right. Thank you, counsel. We'll hear rebuttal. So I want to start on the question of whether there was any impact on the revenues of CAEAP or the clients had complained or there was harm here. Again, this is that I think mirrors the fundamental legal error that the magistrate judge committed, which is that there is no harm requirement. Fraud without harm is not actual. That is surely true. But unclean hands isn't about fraud. I know. But then, you know, in the paragraph above where, you know, the court discusses that point, the court specifically says the evidence fails to establish that the Bruners did falsify utilization reports. I mean, this was a ... The evidence here is kind of messy and this could have gone either way, but this judge looked at the evidence and made a factual finding that the Bruners did not falsify the utilization reports. Doesn't that factual finding, which doesn't look clearly erroneous on this record, make it very difficult to reverse the unclean hands determination? It might be difficult. It's interesting where that statement comes from because the court actually in the section of the argument is talking about whether there's a relationship and then says there's no falsity. I'm not sure what that has to do with the relationship here. I do believe that that's not reconciled with what the court has already said about misleading conduct. There's no situation in which ... No, she said that they were objectively misleading if you just look at them. But what she's making a finding goes to what unclean hands is about, which is what a little bit about their scient or an intent, and she seems clearly to make a finding that they didn't have that intent. And there is such a requirement under a fraud cause of action, but not under unclean hands. You don't need to show that there's been an intentional misrepresentation. That is fraud. It's not unconscious conduct. There's a lower standard here. But it's certainly relevant. It's certainly relevant.  But I believe if you look at the court's discussion of the misleading reports and why they are misleading, the court is not saying that this is okay, that there is a methodology which includes neighbors who shouldn't be accessing these programs at all. It doesn't say that it makes sense that the denominator is inflating the number of people that are accessing, and the numerator only includes employees. She's not saying that that is okay conduct or that's not unconscious conduct. And if you look at the decision, she bases the holding on the fact that there's no relationship here. It's at page 25. It's the last ... I think the last sentence. The reason why this fails is because they haven't shown that there's a direct relation between the alleged misconduct and either alter ego claim or breach of contract. That is not correct. There is a direct relationship here between why this company shut down. And again, it is unrebutted that he shut down the company because he didn't want to report false rates to the clients, and he was worried about what the clients would do. Of course, what would have happened had he done that is speculative, and there's no evidence as to that. But it's unrebutted that the reason why he shut it down was for that purpose. There's no ... The judge does not find that as pretextual. She also doesn't find there's been looting of the company. There's no up until the day that they closed doors there was bad faith conduct. All of the misconduct we're talking about is affirmation, and most of it relates to unity of interest. And the attempt to collapse those two prongs into one prong and not look at where the liability arose, why they couldn't satisfy the contract, and how that's connected to the unclean hands, I think that's a mistake under the law. I have 20 seconds left, so unless your honors have any questions, I would address that. All right. Thank you, counsel. The case just argued will be submitted, and the court for today's session will stand adjourned. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Court for this session stands adjourned.
judges: BYBEE, COLLINS, Curiel